#30811, #30812-a-SPM
**2025 S.D. 69**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                           Plaintiff and Appellee,

    v.

LANCE LOWELL LONG                     Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
CORSON COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE JOHN FITZGERALD
Judge

\* \* \* \*

TODD A. LOVE
Rapid City, South Dakota

                                Attorney for defendant and
                                appellant.

MARTY J. JACKLEY
Attorney General

JENNIFER M. JORGENSON
Assistant Attorney General
Pierre, South Dakota

                                Attorneys for plaintiff and
                                appellee.

\* \* \* \*

                                CONSIDERED ON BRIEFS
                                NOVEMBER 17, 2025
                                OPINION FILED **12/10/25**

MYREN, Justice

[¶1.] Lance Long was convicted in Corson County of three counts of rape, three counts of aggravated assault, and five counts of abuse of or cruelty to a minor. The victims were Long's stepchildren. Other act evidence of similar conduct by Long involving these same children was admitted at trial over Long's objection. The circuit court denied Long's motion for judgment of acquittal regarding one of the rape counts. Long appeals his convictions, and we affirm.

**Factual and Procedural Background**

[¶2.] C.D. (Mother) owned and lived on a ranch in Corson County with her five children, A.A., E.D., A.D., I.A., and J.A. In early 2015, Long moved to the ranch when he and Mother became romantically involved. They later married, and Long became the children's stepfather. The children explained that things were initially good after Long moved to the ranch. Long would take them fishing and horseback riding, and he showed them how to manage the ranch. The children viewed Long as a father figure.

[¶3.] Over time, Long assumed the role of the primary disciplinarian in the home. Long's methods of discipline and punishment progressively became more severe. For instance, A.A. testified that on one occasion she told Long to stop "picking on" J.A. and that he "grabbed me by the back of my head and [ ] smashed the side of my head" on a support beam in a barn. A.A. said that this "split [her] head open" and that she "hit the ground." J.A., the youngest of the children, described an event where Long ran over him three times with a three-wheeler.

[¶4.] Eventually, Long began shocking each of the children with a cattle prod as a form of discipline. A.A. explained that Long would shock her and her siblings when they did "[a]nything he [saw as] unfit behavior, whether it was talking back or doing something that he didn't like." J.A. explained that one time, Long became upset when a saddle J.A. was carrying touched the ground. Long chased J.A. with a cattle prod and eventually shocked him with it. E.D. described an incident in which he and Long were saddling horses and got into an argument. In response, E.D. explained that he "got shocked a couple times in the abdomen." I.A. estimated that Long shocked him with the cattle prod "upwards to 50 to 75" times. A.D. estimated that Long shocked her with the cattle prod "around a hundred times." A.D. related one specific instance when she and A.A. wanted to go on a double date, but Long would only allow them to go if they let him shock them in the genitals with the cattle prod.

[¶5.] Over time, the shockings became more frequent, and Long began using the cattle prod for non-punishment purposes. Long created a game he dubbed the "trust game," in which he would place the cattle prod on a child's leg and ask them if they trusted him. If the child pulled away, they would be shocked. If the child said they trusted Long and did not move, he may still have shocked them.

[¶6.] The family had dogs on the ranch, and Long got shock collars to control their barking. However, the children explained that the shock collars were rarely, if ever, used on the dogs. J.A. and I.A. described how Long put the shock collars around their necks or legs and shocked them instead.

[¶7.]     In addition to physical violence, Long also subjected A.A. to sexual violence. A.A. testified about the first time Long raped her, which happened on St. Patrick's Day when she was fourteen years old. She and Long were watching a movie, and Long "started touching [her], stroking [her], made [her] touch him." A.A. explained that eventually Long "put his penis inside of [her] and it hurt." A.A. testified that she told Long to stop, but that he refused, and she was unable to make him stop. After the incident, Long told A.A. to keep her mouth shut and that "if [she] were to say anything that he would know where to hide [her] body so that no one would [ever] find her." She estimated that she was raped "[u]pwards of 30" more times. She testified that he beat her less frequently once he started raping her.

[¶8.]     In the winter of 2016, Long began bringing illegal drugs (methamphetamine and marijuana) into the home. Although Long used the drugs, he also gave them to E.D. and A.D. E.D. explained that Long "said he wanted to expose us to it now so it didn't ruin our lives in the future." E.D. testified that when Long would give him methamphetamine, "there was a little glass mirror, and it was either crushed up and spread out along the mirror and then you'd take a dollar bill rolled up and either snort it, or there was a glass pipe about yea long with a little ball on the end that it would be in that you'd heat up with a lighter and smoke it." E.D. was fourteen years old and A.D. was thirteen years old when Long first gave them illegal drugs.

[¶9.]     In late 2017 or early 2018, Mother and Long sold the Corson County ranch. The family began traveling around the country competing in rodeos. The

family lived in a trailer for a while before moving in with some of Long's relatives in Oklahoma. The children testified that during this time, they were still being shocked with the cattle prod. E.D. and A.D. confirmed that Long was still giving them illegal drugs during this time.

[¶10.] In 2019, the family moved to Sioux Falls. The children testified that Long still shocked them with the cattle prod and that he was giving methamphetamine to E.D., I.A., and A.D., and was giving marijuana to all the children at this point. After the move to Sioux Falls, Long began shocking the children with a handheld taser, in addition to the cattle prod.

[¶11.] When E.D. was seventeen years old, he decided to enlist in the Marine Corps and spoke to a recruiter. Eventually, he told his recruiter about his home life. The recruiter relayed the information to law enforcement. The next morning, E.D. met with law enforcement at the recruiting office and related the abuse that Long had inflicted on him and his siblings. Ultimately, Long was convicted in other proceedings for the conduct that occurred in Minnehaha County.

[¶12.] Long was subsequently indicted in Corson County in two separate criminal cases. One indictment contained seven counts involving Long's abuse of A.A. It charged him with: (1) second-degree rape; (2) third-degree rape; (3) fourth-degree rape; (4) aggravated assault under SDCL 22-18-1.1(1); (5) two counts of aggravated assault under SDCL 22-18-1.1(2); and (6) abuse of or cruelty to a minor. The second indictment charged Long with five counts of abuse of or cruelty to a minor. E.D. was listed as the victim in two counts, and A.D., A.I., and J.A. were

each listed as the victim in one count.  The two Corson County cases were subsequently joined for trial.

[¶13.]    The State filed a notice that it intended to offer acts from six periods as evidence at trial, which it described as follows:

1.    Abuse and cruelty in Oklahoma between 2015 and 2016. While visiting family in Oklahoma, Defendant shocked the children with a cattle prod.  Defendant also put a shock collar on J.A. and shocked him.  A family member took the shock collar from him afterwards.

2.    Abuse and cruelty in Isabel, South Dakota, prior to 2019. Defendant used a "hot shot" to shock E.D. outside Great Western Bank in Isabel, South Dakota (Dewey County). Defendant grabbed the hot shot from the back of the pickup, opened the backdoor of the pickup, and shocked E.D. twice.

3.    Abuse and cruelty between November 2019 and May 2020.

   a.    Defendant repeatedly shocked E.D., A.D., I.A., and J.A. with a hotshot and/or taser while he and the children lived in the same household.  Defendant shocked the children as punishment and as intimidation.

   b.    Defendant repeatedly kicked and punched I.A. and J.A.

   c.    In May 2020, while living in Sioux Falls, South Dakota, Defendant shocked J.A. with a taser after J.A. took a sex toy out of the garbage.  The taser left red marks on his back and leg that were visible approximately one week afterwards.

   d.    A search of Defendant's storage units in Sioux Falls revealed devices matching the description of the tasers and hotshots given by the children.

   e.    Defendant beat J.A. by holding J.A.'s head between Defendant's legs and beating J.A. on the back.

        f.      Defendant held J.A. while I.A. punched J.A. in the kidneys at Defendant's direction.

    4.      Abuse and cruelty between December 2017 and May 2020. Defendant repeatedly gave E.D. and A.D. illegal drugs (methamphetamine and marijuana) and alcohol. Defendant crushed the methamphetamine on a mirror or a phone and taught the children to snort it. Defendant also showed the children how to smoke methamphetamine and exposed them to various types and ways of using marijuana. The exposure to drugs commonly occurred in Defendant's bedroom.

    5.      Abuse and cruelty in 2020. Defendant gave I.A. and J.A. marijuana and alcohol. Defendant also gave I.A. methamphetamine.

    6.      Sexual abuse in Phillip, South Dakota, between 2015 and 2017. While the family was living in Phillip, South Dakota (Haakon County), Defendant forced A.A. to have sex with him before she could go on a date. . . . The rape occurred on an air mattress at the apartment.

[¶14.]      Long objected to the use of the other act evidence. Following a hearing and briefing related to the evidence, the circuit court allowed the admission of all the evidence. It issued findings of fact and conclusions of law that explained that the evidence was admissible "to show the alleged relationship between Defendant and his alleged MO, mode of operandi, and a unique pattern of behavior occurring with children in this family setting." The circuit court reasoned that the noticed acts and the conduct charged in the Corson County indictments "share similar points in common" such that the evidence "would allow the jury to understand the evidence and determine the facts in an overall sense, not limited to only the alleged events and action in Corson County."

[¶15.]      At trial, nine witnesses testified during the State's case. Each of the children testified and described Long's abuse and cruelty. During her testimony,

A.A. described the details about how Long raped her on St. Patrick's Day. Hollie Strand testified as an expert in the characteristics of abusive relationships involving children. The State also called Brian Nash (the man who witnessed incident #2 in the State's other act evidence notice), Cory Hartley (a law enforcement officer who was involved in the investigation of the crimes that occurred in Minnehaha County), and Adam Eggers (an agent with the South Dakota Division of Criminal Investigation who participated in the investigation of the Corson County crimes). At the close of the State's case-in-chief, Long moved for a judgment of acquittal on the second-degree rape count involving A.A. He argued the State failed to introduce any evidence from which the jury could conclude the act of penetration was accomplished by force, coercion, or threats. The circuit court denied Long's motion and submitted the count to the jury. The jury returned guilty verdicts on all counts in both indictments.

[¶16.] Long appeals, claiming the circuit court abused its discretion when it admitted the other act evidence and that it erred when it denied his motion for judgment of acquittal on the second-degree rape charge.

## Decision

### 1. *Whether the circuit court abused its discretion when it admitted the other act evidence.*

[¶17.] "We review evidentiary rulings under an abuse of discretion standard." *State v. Geist*, 2025 S.D. 32, ¶ 17, 24 N.W.3d 101, 105 (citing *State v. Belt*, 2024 S.D. 82, ¶ 20, 15 N.W.3d 732, 737). "An abuse of discretion is defined as a 'fundamental error of judgment, a choice outside the range of permissible choices, a decision, which on full consideration, is arbitrary or unreasonable.'" *Id.* (quoting *State v.*

*Krueger*, 2020 S.D. 57, ¶ 29, 950 N.W.2d 664, 672). "In order to justify relief on appeal, an evidentiary error 'must also be shown to be prejudicial.'" *Id.* (citation omitted). Prejudicial error is present when there is "a reasonable probability that, but for [the error], the result of the proceeding would have been different." *State v. Carter*, 2023 S.D. 67, ¶ 26, 1 N.W.3d 674, 686 (alteration in original) (citation omitted).

[¶18.] Long's argument is premised on his belief that because the acts described in the State's notice occurred in other counties and states, it was an abuse of discretion for the circuit court to allow their admission into evidence. Specifically, he argues "[i]n the instant case, the elements of the crimes charged all occurred, allegedly, in Corson County. Not in Dewey County, not in Minnehaha County, and certainly not in any other state. Defendant should not be burdened with needing to defend himself from acts that are alleged to have occurred in other jurisdictions other than the one in which he is currently charged."

[¶19.] Long's argument that the other act evidence was inadmissible because it occurred in different counties in South Dakota and in different states has no legal basis. The text of SDCL 19-19-404(b) contains no such requirement, and Long advances no alternative source for such a requirement.

[¶20.] Under SDCL 19-19-404(b), "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." However, such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or

lack of accident." *Id.* "Because the possible uses for other act evidence are limitless, Rule 404(b) only suggests a nonexclusive list of purposes[.]" *State v. Wright*, 1999 S.D. 50, ¶ 14, 593 N.W.2d 792, 798. Thus, "[a]ll that is prohibited under § 404(b) is that similar act evidence not be admitted solely to prove character." *Carter*, 2023 S.D. 67, ¶ 27, 1 N.W.3d at 686 (quoting *State v. Phillips*, 2018 S.D. 2, ¶ 14, 906 N.W.2d 411, 415). "Prior to admitting [other act] evidence, the circuit court must determine whether the evidence is relevant to a material issue other than character and whether its probative value is substantially outweighed by the danger of unfair prejudice." *State v. Rudloff*, 2024 S.D. 73, ¶ 47, 15 N.W.3d 468, 485–86 (alteration in original) (quoting *State v. Evans*, 2021 S.D. 12, ¶ 25, 956 N.W.2d 68, 79).

[¶21.]     The circuit court reasoned: "In this case additional uses exist to show the alleged relationship between Defendant and his alleged MO, mode of operandi, and a unique pattern of behavior occurring with children in this family setting." It concluded that the other acts would help the jury understand the family dynamic in which the abuse occurred.

[¶22.]     Regarding other act evidence in a familial context, this Court has explained "[w]hen an accused had a close relationship with the victim, prior aggression, threats[,] or abusive treatment of the same victim by the same perpetrator are admissible when offered on relevant issues under Rule 404(b)." *State v. Solis*, 2019 S.D. 36, ¶ 23, 931 N.W.2d 253, 259 (quoting *State v. Laible*, 1999 S.D. 58, ¶ 21, 594 N.W.2d 328, 335). This Court has also identified permissible purposes for which such evidence may be used. *See Phillips*, 2018 S.D. 2, ¶ 16, 906 N.W.2d at 415 ("Prior instances of domestic abuse against the same victim are often

relevant in the familial context because they show the *nature of the relationship*[.]" (emphasis added)); *Wright*, 1999 S.D. 50, ¶ 19, 593 N.W.2d at 800 ("The two other acts here were admissible to establish that the defendant had a plan or design to inflict excessive punishment in a similar manner and ferocity regardless of his children's transgression. All that is required to show a common plan is that the charged and uncharged events 'have sufficient points in common.'" (citation omitted)).

[¶23.] The evidence showed that Long assumed the role of primary disciplinarian after he joined this family on their ranch in Corson County. Over time, his punishment of the children became abusive and unconnected to any effort to correct their behavior. He began providing illegal drugs to some of the children and taught them how to use them. The evidence established that this conduct persisted over time and expanded to include all the children. The children testified that the abuse and cruelty continued after the ranch was sold and the family began traveling around the country. Specifically, they described getting shocked (with a cattle prod, a dog shock collar, and a taser), being given illegal drugs, and being physically beaten. Similarly, the evidence showed that Long's sexual abuse of A.A. continued after the family left the ranch.

[¶24.] The circuit court did not abuse its discretion when it admitted the other acts described in the State's notice. The acts depicted the nature of Long's relationship with the children and how Long perpetrated his abuse of these children over a prolonged period and in a manner remarkably similar to the crimes charged in the Corson County indictments. The consistency of the abuse established a

common plan or scheme as envisioned in SDCL 19-19-404(b). "This other act evidence . . . was probative in showing an uninterrupted chain or series of closely connected events between defendant and [the children], allowing the jury to realistically evaluate the charged events in light of the entire history" of abuse and cruelty committed against the children. *State v. Fisher*, 2010 S.D. 44, ¶ 21, 783 N.W.2d 664, 671.

[¶25.] Long also contends that the other acts were too temporally remote to be admissible. In *State v. Evans*, this Court summarized how to determine whether other act evidence was too remote in time to be applied to current proceedings:

> "[W]e have steadfastly refused to adopt an inflexible rule on remoteness." *Wright*, 1999 S.D. 50, ¶ 24, 593 N.W.2d at 802. Instead, admission depends in part "on the nature of the prior acts" and remoteness must be considered with similarity. *State v. Most*, 2012 S.D. 46, ¶ 17, 815 N.W.2d 560, 565. "[T]he two concepts are so closely related; the remoteness of a prior crime takes on increased significance as the similarity between the prior crime and the charged offense [decreases]." *Id.* (quoting *State v. Fisher*, 2010 S.D. 44, ¶ 28, 783 N.W.2d 664, 673). "Thus, a prior bad act, despite its remoteness, may still be relevant if it is strikingly similar to the charged offense. Conversely, less similarity may be required where the prior act is closer in time to the charged incident." *Id.* (citation omitted).

2021 S.D. 12, ¶ 34, 956 N.W.2d at 82 (alterations in original) (footnote omitted). Here, the children described a course of continuing conduct which occurred over a five-year period that exactly mirrored the conduct charged in the Corson County indictments. The striking similarity between the acts and the continuing nature of Long's conduct eliminates any concern about remoteness.

[¶26.] The circuit court did not abuse its discretion by determining that the other act evidence was admissible. Because the circuit court did not abuse its

discretion in admitting the other act evidence, this Court need not consider whether Long was prejudiced by their admission.

### 2. Whether the circuit court erred when it denied Long's motion for judgment of acquittal.

[¶27.]     Long's argument on this issue relates only to the second-degree rape charge involving Long's St. Patrick's Day rape of A.A.  Long argues there was no evidence presented at trial from which a reasonable jury could have concluded that Long accomplished the sexual act with A.A. by "force, coercion, or threats of immediate and great bodily harm[.]"  SDCL 22-22-1(2).  He argues that A.A. "did not testify that any coercion or threats were present.  She did not testify that there existed any use of force, more than that required for the sexual act itself."

[¶28.]     "[A] motion for judgment of acquittal attacks the sufficiency of the evidence, which is a question of law whether the motion is considered before or after the jury's verdict."  *State v. Wolf*, 2020 S.D. 15, ¶ 12, 941 N.W.2d 216, 220.  This Court reviews the denial of a motion for judgment of acquittal de novo.  *Belt*, 2024 S.D. 82, ¶ 35, 15 N.W.3d at 740 (quoting *State v. Brim*, 2010 S.D. 74, ¶ 6, 789 N.W.2d 80, 83).

[¶29.]     "The ultimate question . . . is 'whether there is evidence in the record which, if believed by the fact finder, is sufficient to sustain a finding of guilt beyond a reasonable doubt.'"  *Id.* (quoting *State v. Martin*, 2015 S.D. 2, ¶ 13, 859 N.W.2d 600, 606).  This Court "accept[s] the evidence and the most favorable inferences that can be fairly drawn from it that support the verdict."  *Wolf*, 2020 S.D. 15, ¶ 13, 941 N.W.2d 216, 220 (quoting *State v. Carter*, 2009 S.D. 65, ¶ 44, 771 N.W.2d 329, 342).  "We do not resolve conflicts in the evidence, pass on the credibility of witnesses, or

reweigh the evidence on appeal. If the evidence[,] including circumstantial evidence and reasonable inferences drawn therefrom[,] sustain[s] a reasonable theory of guilt, a guilty verdict will not be set aside." *Id.* (citation omitted).

[¶30.] Second-degree rape is "an act of sexual penetration accomplished . . . [t]hrough the use of force, coercion, or threats of immediate and great bodily harm against the victim or other persons within the victim's presence, accompanied by apparent power of execution[.]" SDCL 22-22-1(2). "Coercion exists when 'one is, by the unlawful conduct of another, induced to do or perform some act under circumstances which deprive her of the exercise of her free will; it may be either actual, where physical force is put on a woman to compel her to do an act against her will, or implied, where the relation of the parties is such that one is under subjection to the other.'" *State v. Townsend*, 2021 S.D. 29, ¶ 22 n.1, 959 N.W.2d 605, 611 n.1 (quoting *State v. Willis*, 370 N.W.2d 193, 199 (S.D. 1985)). *See e.g.*, *State v. Klaudt*, 2009 S.D. 71, ¶ 46, 772 N.W.2d 117, 131–32 (determining "psychological coercion" was present based on the victim's "history, age, vulnerability, and trust and respect for [the defendant]" and the defendant's "authoritative position as a foster parent and state legislator"). "Force" means "the use of physical effort sufficient to overcome, restrain, injure, or prevent escape[.]" SDCL 22-22-1.5(2).

[¶31.] When viewed in the light most favorable to the verdict, there was sufficient evidence to support the jury's guilty verdict related to Long's second-degree-rape charge. As related above, the jury heard extensive testimony describing the domineering nature of Long's relationship with the children,

including A.A. She testified that during the St. Patrick's Day rape, she and Long were watching a movie and he began touching her "inside of [her] panty line." He then made her touch him and then penetrated her with his penis. A.A. explained that Long was positioned on top of her, that she told Long to stop, that he did not stop, and that she could not make him stop. She testified that "it hurt" and that she was bleeding immediately after Long raped her. A.A. testified that Long threatened to kill her if she told anyone and that "if [she] were to say anything," that he knew where to hide her body "so that no one would ever find [her]."

[¶32.] Based on A.A.'s testimony and the favorable inferences drawn from it, the jury could have determined that the sexual encounter between Long and A.A. was the result of both physical and "psychological coercion" as identified in *Klaudt* because of the authoritative and manipulative environment Long created after moving to the ranch, and assuming the role of primary disciplinarian and father figure. 2009 S.D. 71, ¶ 46, 772 N.W.2d at 131–32. Viewed in the light most favorable to the verdict, there was evidence presented that Long raped A.A. by the means of "force, coercion, or threats of immediate and great bodily harm," and the circuit court did not err when it denied Long's motion for judgment of acquittal. We affirm.

[¶33.] JENSEN, Chief Justice, and SALTER and DEVANEY, Justices, and KERN, Retired Justice, concur.

[¶34.] GUSINSKY, Justice, not having been a member of the Court at the time this action was considered by the Court, did not participate.